IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:   :   CASE NO. 06-04755

  :

NEWCOMM WIRELESS SERVICES, INC.:   CHAPTER 11

  :

  Debtor   :

_____ :

## OPINION AND ORDER

Before the court is "Debtor's Motion for the Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 365(a) Authorizing and Approving the Assumption of the Debtor's Employment Agreements with Seven Key Employees and its Success Bonus Program" filed on January 26, 2007 (dkt. #274)[1]. The U.S. Trustee filed an objection on February 8, 2007 (dkt. #307), to which the debtor filed a response on February 11, 2007 (dkt. #313) along with the declaration of Javier Lamoso, debtor's president and CEO, in support thereof (dkt. #315). Additionally, on February 11, 2007, the Official Committee of Unsecured Creditors filed a response in support of the debtor's motion (dkt. #314). The U.S. Trustee filed a sur-reply on February 14, 2007 (dkt. #323).

The Employment Agreements for the seven key employees include an annual incentive bonus, which is estimated at a maximum total cost of $260,000.00 for the seven key employees; an

_____

[1]On that same date the debtor filed a "Motion for Authorization to File Under Seal the Employment Agreements between NewComm and the Key Employees and the Success Bonus Program in Connection with the Debtor's Motion for the entry of an Order Authorizing and Approving the Assumption of the Debtor's Employment Agreements with Seven Key Employees and Its Success Bonus Program" (dkt. #276); said request was granted by the court's order of February 14, 2007, entered on February 16, 2007 (dkt. #335). The U.S. Trustee and the Official Committee of Unsecured Creditors were given a copy of the documents filed under seal.

emergence bonus upon the occurrence of an emergence event, including the closing of the sale of debtor's assets, which is estimated at a maximum total cost of $425,000.00 for all seven key employees; and severance payments, in the event of separation, with a maximum total cost for the seven key employees of $1,100,000.00. The Success Bonus Plan applies to twenty critical employees, other than the key employees, and has a maximum amount of approximately $300,000.00. Thus, the total estimated cost of the Employment Agreements for the seven key employees is $1,785,000.00 and, including the Success Bonus Plan for all eligible employees, is $2,085,000.00.

A hearing was held on February 12, 2007, addressing several matters, including the assumption of the key employees employment agreements and success bonus program (see Minutes of Proceeding, dkt. #333). The court found that only two of the seven key employees, Javier Lamoso and Federico Grosso, are insiders, and therefore granted the assumption request as to the remaining five key employees[2], and took the issue as to Mr. Lamoso and Mr. Grosso under advisement.

On March 7, 2007, a hearing was held and the court entered an order approving the sale of debtor's assets to PR Wireless, Inc., pursuant to the auction held on February 28, 2007, for

---

[2]The U.S. Trustee argues in its objection to the debtor's assumption motion that "NewComm previously admitted that the seven key employees covered by the Assumption Motion are insiders of the debtor for purposes of §§ 503(c)." (Dkt. #307 at ¶ 4). However, the minutes of the proceedings on February 12, 2007, at which debtor's motion was heard, indicate that "[b]ased upon the pleadings and arguments heard today, the court found that of the seven key employees, only two are insiders: Mr. Javier Lamoso and Mr. Federico Grosso. Debtor's motion (#274) was granted as to the remaining six [sic] key employees. The issue as to Mr. Lamoso and Mr. Grosso was taken under advisement to determine if § 503 applies to the set of facts before the court." (Dkt. #333). An order was entered granting the debtor's motion as to the five non-insider employees on April 20, 2007 (dkt. #508).

- 2 -

approximately $160 million[3]; as well as the assumption, sale and assignment to PR Wireless, Inc. of certain executory contracts and unexpired leases of the debtor (dkt. #394).  The consummation of the sale is pending.

For the reasons set forth below, the debtor's "Motion for the Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 365(a) Authorizing and Approving the Assumption of the Debtor's Employment Agreements with Seven Key Employees and its Success Bonus Program" (dkt. #274) is granted as to Javier Lamoso and Federico Grosso.  In addition, the debtor's request, as it pertains to the Success Bonus Plan for the twenty critical, non-key employees, is approved.

### Findings of Fact[4]

*Introduction*

1. NewComm commenced its case under chapter 11 of the Bankruptcy Code on November 28, 2006.  Debtor did not intend, and is not attempting, to reorganize as a stand-alone business, but

---

[3]The base purchase price for debtor's assets was $110 million.  After various adjustments, the purchase price lowered to the adjusted purchase price of $103 million.  The asset purchase agreement provided that if the specified liabilities exceeded the adjusted base purchase price, then the additional purchase price would be an amount equal to the difference between the specified liabilities and the adjusted base purchase price.  In this instance, the specified liabilities - the Debtor-in-Possession Credit Agreement (DIP Facility), any amounts outstanding under the DIP Facility, any amounts outstanding to the pre-petition secured lender, certain administrative expenses, most administrative expenses with certain caps, and priority claims - were approximately $115.5 million.  The difference - approximately $12.5 million - became the additional purchase price.  At the auction, the successful bidder  - PR Wireless, Inc. - entered a final bid of $45.1 million above said amount, resulting in a final purchase price of approximately $160.6 million.  See Transcript of Hearing on 3/7/07, dkt. #429.

[4]The Findings of Fact are based upon the declaration of debtor's president and chief executive officer, Javier Lamoso, (dkt. #315) submitted in support of debtor's response to the U.S. Trustee's objection to the debtor's motion requesting authorization for the assumption of the employment agreements with the seven key employees.  The declaration was proffered as Lamoso's testimony at the hearing held on February 12, 2007, and he was available for cross-examination by any party (dkt. #343 at pp. 15, 39 and 73).  Mr. Lamoso's declaration is not contested.

rather is using the Bankruptcy Code to maximize its value through an immediate section 363 sale of substantially all of its business assets. Accordingly, among the papers filed on the first day was an emergency motion seeking approval of bidding procedures and approval of a sale pursuant to the terms of an Asset Purchase Agreement ("APA") with PR Wireless, Inc.

2. The work being performed by the debtor's key employees was critical for a successful transaction pursuant to the APA and the bidding procedures. In addition to their regular duties and the general administration of the case, their assistance in the sale process was required (I) to get to the closing of the sale with as few downward adjustments and as many upward adjustments to the Base Purchase Price as possible (which adjustments are largely based upon the performance of the debtor's business operations between the petition date and the closing date); (ii) to operate the business in such a manner as to avoid any defaults under the DIP financing order or the APA, so that the Stalking Horse is required to close the sale transaction; (iii) to manage the current upgrade and build-out of the debtor's network in compliance with the Nortel Agreement, the DIP and the APA; and (iv) to help market the Debtor's business to potential purchasers by (a) responding to voluminous due diligence requests, and (b) participating in numerous multi-day meetings with potential purchasers and their advisers.

3. Each of the key employees is a party to an employment agreement with the debtor (the "Employment Agreements"). These Employment Agreements were the subject of extensive discussions by NewComm's Board of Directors (the "Board") before the Board passed a resolution adopting the terms of the agreements that were executed by the key employees months in advance of the petition date. The Employment Agreements were an integral part of the sale process in that they were designed to align the interests of the key employees with the constituents' interests in a successful transaction, while also protecting potential buyers and maximizing value by providing

protective provisions such as non-compete, non-solicitation and confidentiality covenants that preserve the value of the assets post-transaction. Upon embarking upon the sale of the company, the Board understood the need to provide adequate incentives keyed into the performance being requested - the facilitation and closure of the sale of assets, which the employment agreements were specifically designed to incentivize and reward.

*Background*

4. Following the commencement of the involuntary case by Atento de Puerto Rico[5] and the scuttling of NewComm's first marketing effort, the Board elected to further pursue its strategic options. Understanding the intense work that would be required as part of this second marketing effort, that key employees were being asked to potentially work themselves out of a job, and in order to incentivize and reward the key employees to bring this marketing process to a successful result, the Board considered and ultimately adopted the Employment Agreements.

5. The Employment Agreements were the subject of extensive debate and discussed in three separate meetings of the Board composed of appointees from the debtor's equity holders, all conducted between July 31 2006 and August 4, 2006. The Board concluded in its business judgment that the terms of the Employment Agreements were necessary and approved a resolution adopting their terms. In return, the key employees each provided a number of concessions as consideration for the Employment Agreements, namely agreements to not compete, to not solicit, and to maintain confidential information. The Board believed that these covenants would be important to a potential purchaser as a means to preserve the assets post-transaction in the event the employee was terminated.

a        Non-Competition - each key employee agreed that for the year following the

[5]The debtor and Atento have proffered to have entered into a Global Settlement.

- 5 -

termination of their employment with NewComm that they would not become employed by a competitor, as defined in the Employment Agreements, acquire an ownership in a competitor, or solicit customers or vendors of NewComm on behalf of or for the benefit of a competitor.

b.   <u>Non-Solicitation</u> - for the year following termination, the key employees agreed not to hire or seek to hire any then-current NewComm employee or seek to encourage any employees to leave NewComm's employ.

c.   <u>Confidentiality</u> - following their termination, the key employees would be prohibited from ever disclosing any confidential information learned by them during the course of their employment.  There is no time restriction in this limitation.

6. While substantial, these concessions do not constitute the full extent of the consideration provided by each key employee.  Knowing they were obligated to maximize the value of the estate in a strategic transaction, each key employee has been required to perform their regular activities as well as any additional acts necessary to market the assets of the company and successfully close a transaction.

7. Following the execution of the Employment Agreements, the key employees worked diligently to effectuate a strategic transaction.  Ultimately, no party was interested in entering into a transaction with NewComm outside of bankruptcy and the only viable offers received by the Company were for the sale of substantially all of its assets pursuant to the terms of a section 363 asset sale.

8. After significant arms-length negotiations, the debtor entered into the APA and the Debtor-in-Possession Credit Agreement (the "DIP Facility").  Those agreements were based on, among other things, the debtor's business plan to build-out and upgrade its existing Code Division Multiple Access Network with 1xRTT equipment from Nortel.

9. The APA includes a Base Purchase Price of approximately $110,000,000.00 subject to various adjustments.  However, recognizing that the adjusted base purchase price would not satisfy even the debtor's administrative claims, the debtor and its advisors worked to include an addendum

to that calculation to ensure that the ultimate amount paid for the assets would at least satisfy each of the debtor's secured claims, FCC liabilities, cure amounts for assumed contracts, administrative claims and priority claims (including obligations under the Employee Agreements).  Without this minimum assurance, NewComm did not believe it would be appropriate to initiate a Chapter 11 proceeding.  Given the lack of alternative bids, defaults under various loan agreements and the lack of cash to make payroll, the only alternative to a bankruptcy proceeding would have been to surrender the collateral and to permit the pre-petition secured lenders to foreclose.  Foreclosure, however, would ensure no recovery for unsecured creditors (including those with priority claims or otherwise assumed executory contracts) and put at risk the jobs of the debtor's entire workforce.

10. Shortly after the petition date, the U. S. Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") who evaluated the Employment Agreements in connection with their examination of the full employment package of each key employee.  The Committee did not seek any modifications to the five Employment Agreements of the non-officer employees, but did request modifications to the Employment Agreements of Lamoso and Grosso, requiring them to remit a portion of their severance in the event that they obtain alternative employment in the year following their termination.  The debtor agreed to those changes.  No other changes were made to the Employment Agreements of the key employees as the Committee recognized that the only way for their constituency to recover anything from this case would be if the key employees continued to work to preserve and maximize the value of the estate, to assist other parties with their due diligence, to close a successful transaction, and to assist in certain other matters.

*The Insider Key Employees*

11. Javier Lamoso became the debtor's President and Chief Executive Officer in October, 2004.  Since that time, he has utilized his extensive strategic, operation, and leadership experience

- 7 -

in the telecommunications industry to implement a dramatic operational and cost-cutting overhaul. These improvements include: (I) creating a company controlled call center, which has reduced costs and essentially eliminated complaints to the local telecommunications board; (ii) enhancing NewComm's marketing efforts; (iii) creating an in-house collection department and modifying credit policies to improve the collection of bad debts; (iv) reducing vendor payable balances; and (v) hiring and retaining many of the key employees.  He has also developed a number of key vendor relationships, taken the lead on cost cutting initiatives, and was one of the main negotiators of the Nortel Agreement.

12.  Federico Grosso is the debtor's Chief Financial Officer.  He has complete knowledge of the debtor's financial systems, books and records.  He is completely responsible for the debtor's customized program to track and collect receivables to properly bill customers.  He has assumed the lead in coordinating the network transition with Nortel - any glitches or outages in this transition could lead to a huge impact on the debtor's reputation and significantly damage the debtor's ability to maintain existing subscribers and to attract new subscribers.  In addition, Mr. Grosso is keenly award of the debtor's historical liabilities, information which will be requested from parties performing due diligence and will be needed at the time of claims processing and during other upcoming events in the current proceeding.

*The Employment Agreements*

13.  The provisions of the Employment Agreements for each of the key employees are substantially the same with the exception of the base salaries.  The Employment Agreements are each for a term of one year (the "Initial Term") from the effective date of the Employment Agreements and expire in August, 2007.  Absent written notice, which must be given 30 days before the end of the existing term, each key employee's employment will continue for successive six-

- 8 -

month intervals until such employment is terminated upon thirty days written notice by either the debtor or the key employee that is party to the relevant Employment Agreement.

14. In addition to annual base pay, each of the key employees is eligible to receive performance-based bonus compensation awarded annually at approximately thirty percent of annual base pay subject to the achievement of certain EBITDA target goals (the "Performance Bonus Program"). The Performance Bonus Program is determined by NewComm's Board of Directors in its sole discretion for each fiscal year. The maximum total cost of the Performance Bonus for all seven Key Employees is approximately $260,000.00 and has previously been approved by the court as part of the first day employee motion. The program was also independently reviewed by the Office of the U.S. Trustee and the Committee.

15. Each key employee is also eligible to receive an emergence bonus (the "Emergence Bonus") equal to one-half of annual base pay, payable upon the occurrence of an emergence event (the "Emergence Event"). An emergence event includes any of the following events: (I) the debtor's successful emergence from chapter 11 bankruptcy, encompassing the consummation of a plan of reorganization that provides for reorganization, liquidation, and/or asset sale scenarios; or (ii) the closing of a sale transaction of substantially all of the debtor's assets pursuant to section 363 of the Bankruptcy Code. The maximum total cost of the Emergence Bonus for all seven key employees is approximately $425,000.00.

16. Each key employee will also receive vacation time, a car allowance, the reimbursement of various expenses, and various other benefits commensurate with each key employee's experience and position.

17. In the event NewComm terminates the employment of a key employee without cause, or if a key employee terminates his employment for good reason, as those terms are defined in the

- 9 -

Employment Agreement, the key employee is entitled to the following payments (the "Severance Payments"):

    a.    An amount equal to the accrued, but unpaid portion of the key employee's annual base salary, annual incentive bonus, vacation days, and other benefits;

    b.    An amount equal to the prorated annual incentive bonus;

    c.    With respect to Javier Lamoso, an amount equal to two times annual base salary, and with respect to the other key employees, an amount equal to annual base salary; and

    d.    An amount equal to the Success Bonus upon an Emergence Event.

18. In the event that all seven key employees are terminated and receive such payments, the maximum total cost of the Severance Payments is approximately $1,100,000.00.

19. Elimination of the Success Bonuses and severance payments (if any) to be made to the key employees only reduces the purchase price to be paid by the Stalking Horse without any increase in the amount available to unsecured creditors. It is, in essence, being paid out of the secured lender's recovery.

20. The current APA is the result of two successive marketing efforts. The initial negotiations with the proposed purchasers resulted in an agreement that would likely only satisfy the debtor's secured obligations. However, as PR Wireless, Inc. wanted to acquire the debtor's assets with the protections provided by section 363 of the Code, NewComm insisted that the minimum purchase price be adjusted to satisfy the costs entailed with that protection, including satisfaction of the Debtor's pre-petition secured obligations, the DIP Facility, administrative expenses, cure costs and priority claims (including obligations under the Employment Agreements).

21. The unsecured creditor body is not adversely affected in any way by the potential payment under the Success Bonus and Severance provisions of the Employment Agreements. Any such payment is simply reflected as an increase in the purchase price - it is a specified liability of the

purchaser that is a component of the additional purchase price.

22. In fact, if either or both the Success Bonus or Severance obligation is removed from the Employment Agreements, the only party to benefit will be the successful purchaser by way of a reduction in the total purchase price to be paid - assuming the sale would ultimately be consummated.

23. The adjusted base purchase price under the APA, plus estimated cash on hand at the closing, is insufficient to pay the DIP, the pre-petition secured claims, administrative expenses, estimated cure claims and priority claims, even excluding any obligations under the Employee Agreements. Jefferies estimated that the Stalking Horse Purchaser will have to pay $4.5 million in excess of the adjusted base purchase price excluding any obligation under the Employee Agreements. If the amounts under the Success Bonus and Severance provisions to the key employees are included, the purchaser would have to pay an additional amount of up to $425,000.00 for the total success bonus and up to $1.1 million if they terminate all of the key employees. Either way, the unsecured creditors do not get any more or less of a recovery.

24. Not a single party with an economic interest in this case, from the most senior secured lender to the most junior interest holder, objects to the Success Bonus or Severance provisions included in the Employment Agreements as they each recognize that it is only through the continuing efforts of the key employees that they will maximize their recovery in this case. Furthermore, it should be noted that each qualified bidder who evaluated the debtor's business for potential acquisition was advised of the costs of these programs and none expressed opposition.

25. The Success Bonus provision included in the Employment Agreements is in essence a performance based incentive plan. It is based upon and in consideration of the significant duties that are expected of the key employees throughout this reorganization process leading to and dependent

upon a sale to the Stalking Horse bidder or some other higher and better bidder. Their actions are expected to both preserve and enhance the value of the estate.

26. If the transaction with the Stalking Horse or some other bidder does not close because of operational or other deficiencies between now and the contemplated closing, the key employees do not get a bonus. The Success Bonus is designed to partially incentivize and reward them for getting the debtor to that closing and running the auction process.

27. This business is not on auto-pilot. It involves intensive effort each day, and performance of the highest caliber.

28. The key employees' duties require an enormous commitment and effort by each of them. Such performance is exactly what the Success Bonus program and protection of severance is designed to induce and reward. Among other tasks, the key employees have performed the following since the execution of the Employment Agreements:

a. Responding to due diligence requests from parties in the second marketing effort and assisting Jefferies in constructing a due diligence room.

b. Working with the proposed stalking horse purchaser to assist in due diligence.

c. Negotiating a $38 million junior DIP Facility.

d. Negotiating an Asset Purchase Agreement for the sale of substantially all of the debtor's assets with an adjustment to ensure payment of secured, administrative and priority claims.

e. Working with the stalking horse purchaser to construct the various schedules, appendixes and exhibits to the asset purchase agreement and the DIP Facility.

f. Evaluating the existing network and constructing an RFP for an enhancement and build-out of the network.

g. Negotiating with respondents to the RFP and ultimately selecting N Nortel for the enhancement and build-out.

h. Negotiating the terms of the Nortel Agreement for the substantial build-out and upgrade of the Company's existing network.

- 12 -

I. Working to obtain multiple waivers with the debtor's pre–petition unsecured lenders pending negotiation of the DIP, the APA and the Nortel Agreement.

j. Working to analyze and then subsequently negotiate with critical vendors to ensure an uninterrupted supply of the debtor's most critically needed goods and services.

k. Assisting in the development of a cure schedule for use in the sale process.

l. Working with advisors to the stalking horse purchasers prior to execution of the APA to advise them on the Company, its personnel, its operations, its budgets and other inquiries raised in meetings.

m. Aiding Jefferies in the preparation of the data rooms for parties interested in participating in the section 363 process.

n. Responding to the inquiries of parties interested in participating in the 363 process.

o. Conducting multi-day question and answer sessions with qualified bidders and their advisers related to, among other things, business plans, operations, finances, marketing, human resources, the buildout and upgrade, and performance following the petition date.

p. Assisting counsel for the debtor in constructing a multi-count complaint against Telefonica, S.A. and parties within the Telefonica group seeking to recharacterize and subordinate any claims by the Telefonica group.

q. Providing constant updates to the DIP lenders and their advisors as well as the stalking horse purchaser.

r. Locating additional tower sites for the build-out and upgrade and negotiating the terms of those agreements.

s. Negotiating cure disputes and modified contract terms for valuable executory contracts.

t. Negotiating and entering into a lease amendment with TLD of Puerto Rico, Inc. including reducing rent, eliminating unnecessary space, and resolving a potential cure amount of over $2,000,000.00 for $150,000.00.

u. Participating in meetings with the Creditor's Committee.

v. Achieving all of the operational and financial covenants in the APA and DIP.

29. Furthermore, as described above, each of the key employees provided consideration to the estate for these Employment Agreements. Among other things, they agreed to be bound by

- 13 -

covenants not to compete, not to solicit other employees, and to maintain confidentiality. These protections were deemed critical by the Board to induce purchasers to bid a fair price for the debtor's assets without fear that the existing key employees, if not retained by the buyer, would diminish the value of the assets being purchased. Stripping the Success Bonus and Severance provisions from the Employment Agreements would negate the consideration provided to the key employees for their agreement to these covenants, would render them unenforceable, and clearly not be in the best interests of the estate.

30. In order to maximize the value of this estate and to ensure the company achieves the various targets established for it in the DIP and the APA, Lamoso requested that a number of key employees sacrifice vacation plans and work significantly longer hours to ensure the debtors meets and exceeds those targets.

31. The U.S. Trustee does not contest debtor's business judgment in assuming the Employment Agreements. See Transcript of Hearing held on 2/20/07, dkt. #343 at p. 55.

32. The U.S. Trustee does not question the executory nature of the Employment Agreements. See Transcript of Hearing held on 2/20/07, dkt. #343 at p. 111.

33. The annual incentive bonus portion of the Employment Agreements was previously approved by the court as part of the first day employee motion. At the hearing on the first day motions which was held on November 30, 2006, the U.S. Trustee raised no objection to said bonus with respect to non-insiders and requested until December 8, 2006, to review the bonus with respect to the seven key employees; it subsequently determined that the annual incentive bonus plan and target goals are not a *sub rosa* retention or severance bonus plan and therefore did not object to them as to the seven key employees. See "Objection of United States Trustee to Debtor's Motion for Entry of Order Authorizing and Approving Assumption of Employment Agreements with Seven Key

- 14 -

Employees and Success Bonus Program", dkt. #307 at para. 14 on p. 4.  Accordingly, the annual incentive bonus portion of the Employment Agreements is not at issue.

34.  The Official Committee of Unsecured Creditors ("the Committee") has stated that shortly after its appointment it evaluated the key employees' employment packages and engaged in considerable negotiation with the debtor, after which the parties agreed to modify the agreements with Lamoso and Grosso.  Further, the Committee states that it fully supports debtor's assumption motion.  See Response, dkt. #314.

## Discussion

The debtor requests the court's approval to assume the Employment Agreements and the Success Bonus Plan pursuant to 11 U.S.C. § 365(a); it argues that it may assume or reject any executory contract or unexpired lease pursuant to 11 U.S.C. § 365(a), and that said decision to assume or reject is within the business judgment of the debtor.

The U.S. Trustee objects, arguing that the debtor's request disregards the significant changes to, and restrictions imposed upon, executive incentive and severance payments enacted by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), that parts of the Employment Agreements are barred by 11 U.S.C. § 503(c), and that debtor has made no attempt to demonstrate its compliance therewith. According to the U.S. Trustee, the emergence bonus is a classic retention bonus which runs afoul of § 503(c)(1) of the Code, prohibiting payments to insiders to induce them to remain with the debtor, and the proposed severance payments are contrary to § 503(c)(2) of the Code, which expressly prohibits them unless the requirements of §§ 503(c)(2)(A) and (B) are met.

Debtor responds that § 503(c) does not apply to the agreements at issue herein but, in the event it does, the agreements are in compliance with it.  According to the debtor, under the unique

circumstances of this case, including the additional purchase price adjustment contained in the asset purchase agreement, the success bonus and severance payments do not fall within the ambit of § 503 and the only party who would benefit from their removal from the employment agreements is the purchaser, PR Wireless, Inc.  Debtor further argues that the success bonuses are performance based and therefore not proscribed by § 503(c)(1) and, if § 503(c)(2) applies, the proposed severance payments are within the range of the statute.

Whether or not the pre-petition employment agreements are an incentive plan, or a retention agreement to be paid as an administrative expense, thus falling under the prohibition and exceptions of section 503(c), is a fact intensive determination.

*11 U.S.C. § 365(a)*

Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Although the section does not define what is an "executory contract", the legislative history refers to the "Countryman definition", that the term executory contract "generally includes contracts on which performance remains due to some extent on both sides."  3 Lawrence P. King, et al., Collier on Bankruptcy ¶ 365.02[1] (15th ed rev'd 2007).  The Employment Agreements at issue herein are executory contracts; said fact is not contested by the U.S. Trustee.  See Transcript of hearing, dkt. #343 at p. 111.

Most courts apply a "business judgment" test in evaluating a trustee or debtor-in-possession's decision to assume a contract.  Collier ¶ 365.03[2] at p. 365-26.  In Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993), the court found that "a bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine [the] contract and the surrounding circumstances and

- 16 -

apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." The court should approve a debtor's business decision unless it is the product of bad faith, whim or caprice. Lubrizol Enters. v. Richmond Metal Finishes, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert denied*, 475 U.S. 1057 (1986); Johnson v. Fairco Corp., 61 B.R. 317, 320 (N.D. Ill. 1986).

The U.S. Trustee does not question the debtor's business judgment[6]; rather, she argues that the Employment Agreements contravene the provisions of 11 U.S.C. § 503(c), which may not be circumvented by seeking approval of the assumption of said agreements pursuant to 11 U.S.C. § 365(a).

*11 U.S.C. § 503(c)*

Section 503 of the Bankruptcy Code provides for the allowance of administrative expenses. Subsection (a) states that "[a]n entity may timely file a request for payment of an administrative expense", and subsection (b) sets forth which type of administrative expenses should be allowed, after notice and a hearing, including, in subpart (1)(A) "the actual, necessary costs and expenses of preserving the estate, including (I) wages, salaries, and commissions for services rendered after the commencement of the case." 11 U.S.C. § 503.

Subsection (c) of section 503 provides:

> Notwithstanding subsection (b), there shall neither be allowed, nor paid—
>
> (1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that—
>
> (A) the transfer or obligation is essential to

---

[6]See Transcript of Hearing, dkt. #343 at p. 55.

- 17 -

retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

(B) the services provided by the person are essential to the survival of the business; and

(C) either—

(I) the amount of the transfer made to, or obligation incurred for the benefit of the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

(ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

(2) a severance payment to an insider of the debtor, unless—

(A) the payment is part of a program that is generally applicable to all full-time employees; and

(B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

(3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

- 18 -

11 U.S.C. § 503(c).  The purpose of this section, which was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, was to "limit the scope of 'key employee retention plans' and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor."  4 Lawrence P. King, et al., Collier on Bankruptcy ¶ 503.17 (15th ed rev'd 2007).  The commentator notes that although there are exceptions to the restrictions placed on insider retention and severance payments, "it is difficult to discern the scope of the exceptions" and they "seem to be so narrowly drawn...that very few insider retention or severance plans will meet the necessary qualifications." Id. at 503-81.

Section 503(c)(1) contains a narrow exception to its limitation on transfers or obligations to insiders to induce them to remain with the debtor's business; this exception may arise if the court finds, based upon evidence in the record, that three tests have been satisfied.  Collier, ¶ 503.17[1].  "The first test is that the transfer or obligation is necessary to retain the insider because the insider has a bona fide job offer from another business at the same or a great rate of compensation; [t]he second test is that the services provided by the insider are essential to the survival of the business; [and] [t]he third test sets a limit on the amount of the payment or obligation."  Id. at 503-81.

"Section 503(c)(2) prohibits severance payments to an insider of the debtor unless two tests are satisfied.  First, the payment must be part of a program that is generally applicable to all full-time employees, [and] [t]he second requirement is that the amount of the payment to the insider is not greater than ten times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made."  Collier, ¶ 503.17[2].

Section 503(c)(3) is a "catch all" provision that prohibits administrative expense status to any obligation that is both outside the ordinary course of business and not justified by the facts and circumstances of the case.  Collier, ¶ 503.17[3] at 503-84.

*Case law interpreting and applying Section 503(c).*

The applicability of section 503(c) to a chapter 11 debtor's request for court authorization to enter into employment agreements with its CEO and key employees was considered by the United States Bankruptcy Court for the Southern District of New York in the reorganization case of Dana Corporation, In re Dana Corp., 351 B.R. 96 (Bankr. S.D.N.Y. 2006) ("Dana I") and, upon debtor's motion for reconsideration[7], In re Dana Corp., 358 B.R. 567 (Bankr. S.D.N.Y. 2006) ("Dana II"). In Dana I, the court examined whether the compensation plan that debtors proposed to enter into with its executives was a "Pay to Stay" compensation plan, a/k/a a Key Employee Retention Plan or "KERP", subject to the limitations of 11 U.S.C. § 503(c), or whether it could be construed to be an incentivizing "Produce Value for Pay" plan to be evaluated as a business judgment under S 363. 351 B.R. at 98. The debtor proposed its executives be paid a base salary, an annual incentive plan bonus, and a "target completion bonus", as well as a senior executive retirement program and non-compete component.

In Dana I, the court noted that "[u]nder the BAPCA, section 503(c) establishes specific evidentiary standards that must be met before a bankruptcy court may authorize payments made to an insider for the purpose of inducing such person to remain with a debtor's business, or payments made on account of severance." 351 B.R. at 100. Further, "to the extent a proposed transfer falls within sections 503(c)(1) or (c)(2), then the business judgment rule does not apply, irrespective of whether a sound business purpose may actually exist." Id. at 101. However, the court then went on to note that although the U.S. Trustee argued that the court should apply 503(c)(1) and (2,) and the debtor argued that 503(c)(3) did not apply, in fact other courts have addressed executive

---

[7]Although Dana II came before the court upon debtor's motion for reconsideration, the court considered the proposed executive compensation motion *de novo*, and found the motion for reconsideration to be moot. 2006 WL 3479406 at p. 2.

compensation motions after BAPCA and applied 503(c), finding that the debtors in those cases had used their business judgment is formulating their compensation plans and that the plans did not violate 503(c). Id. The court in Dana I concluded that the compensation plan at issue did not meet the requirements of the business judgment rule under §363 nor the limitations of §503(c), while noting that incentive plans which may have some components that arguably have a retentive effect do not necessarily violate §503(c)'s requirements. 351 B.R. at 103.

In Dana II, the court considered a re-vamped compensation plan proposed by the debtor and concluded that, although it had some retentive impact, it was incidental and insufficient to trigger the restrictive requirements of §503(c), and that debtor's proposed assumption of the employment agreements was a fair and reasonable business judgment and was consistent with § 503(c)(3)[8]. 358 B.R. at 572. The court noted that "the test in section 503(c)(3) appears to be no more stringent a test than the one courts must apply in approving any administrative expense under section 503(b)(1)(a)[9]" and concluded that "section 503(c)(3) gives the court discretion as to bonus and incentive plans, which are not primarily motivated by retention or in the nature of severance." Id. at 576, citing In re Nobex Corp., 2006 Bankr. LEXIS 417 (Bankr. D. Del. Jan. 19, 2006)(court concluded that section 503(c)(3) was nothing more than a reiteration of the standard under 363 under which courts had previously authorized transfers outside the ordinary course of business based on the business judgment of the debtor). The court noted that:

> Generally, courts take a holistic view of and measure acceptability of compensation packages through the prism of several factors including:

---

[8]The Court noted that "the Debtors are not moving under section 503(c)(1)" and concluded that sections 503(c)(1) and (c)(2) are not "operative". 358 B.R. at 576.

[9]"Any expense must be an actual, necessary cost or expense of preserving the estate." 358 B.R. at 576, citing 4 Collier on Bankruptcy ¶ 503.17[3] (15th ed. 1982).

- 21 -

–whether the amount of cost or expense is reasonable and in the best interest of the estate;

–whether the services to be provided are likely to enhance a successful reorganization or liquidation of the debtor;

–whether the debtor exercised appropriate business judgment in implementing any application for continuing, resuming, or retaining the executive.

358 B.R. at 571. Applying this holistic approach, and "[r]ecognizing the potential limitations of section 503(c) of the Bankruptcy Code as it applies to those employee retention provisions that are essentially "pay to stay" key employee retention programs ("KERPS")", the court found that "a *true* incentive plan may not be constrained by 503(c) limitations". Id. In evaluating whether a compensation plan meets the "sound business judgment" test under § 503(c)(3), courts should consider the following factors:

–Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, *is the plan calculated to achieve the desired performance?* (emphasis in original)

–Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

–Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

–Is the plan or proposal consistent with industry standards?

–What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

–Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

358 B.R. at 576-577 (citations omitted).

In the case of In re Nobex Corp., 2006 WL 4063024 (Bankr. De. Jan. 19, 2006), the court approved the payment of sale-related incentives to senior management pursuant to 11 U.S.C. §§ 105, 363(b) and 503(c)(3). The court, noting that debtor "seeks to preserve its assets while pursuing a sale of substantially all of its assets pursuant to an orderly sale process which the Debtor has proposed to this Court", found that

> – Debtor's senior management were needed to make significant contributions to the due diligence process, the marketing of debtor's assets, and to induce the submission of competing bids.

> –The "experience, expertise, and enthusiastic involvement" of the debtor's management was critical to the successful implementation of the sale procedure.

> –The senior management were the "only personnel with the necessary skill and experience to implement the sale procedures" and their post-petition sale efforts "will extend well beyond their ordinary course responsibilities and will be critical to the Debtor's sale efforts".

> –The debtor's proposed sale-related incentive pay to these executives accomplished a sound business purpose, was endorsed by the Official Committee of Unsecured Creditors, and was an appropriate exercise of the debtor's business judgment.

> –The structure of the proposed compensation, which did not provide the incentive to the executives unless the gross sale price achieved exceeds the proposed stalking horse bid, established that it is not a retention bonus.

Slip op. at 2, 3. The court in Nobex concluded that the incentive pay at issue is not governed by sections 503(c)(1) or (2) of the Code, and that it is not prohibited by section 503(c)(3) of the Code. Slip op. at 3.

The topic was again addressed in In re Global Home Products, LLC, 2007 WL 689747

- 23 -

(Bankr. D. Del. March 6, 2007), wherein the debtors sought the court's approval to implement a performance and incentive based bonus plan and an incentive based sales bonus plan over the objection of the employee's union. The court found that the plans were nearly identical to those in effect during the past ten years, were unanimously approved by the debtor's board of directors and were intended to be self-funded. Id. at p. 4. The court further found, based upon expert testimony, that the plans were reasonable, typical and common and within market norms when compared with similar companies. Id. at p. 5. Noting that its decisions turns on whether the plans are designed to retain employees, and therefore subject to the restrictions of § 503(c), or intended to incentivize management and key employees, and consequently subject to review under the more liberal business judgment standard under § 363, the court concluded that the plans were "incentivizing and only coincidentally retentive" and, therefore, § 503(c) does not apply. Id. at pp. 5, 8. Accordingly, the court approved the plans under § 363, finding them to be a proper exercise of the debtor's business judgment. Id. at p. 9.

Most recently, in In re Nellson Nutraceutical, Inc., 2007 WL 1502169 (Bankr. D. Del. May 24, 2007), the bankruptcy court examined the interplay between sections 363(c)(1) and 503(c) of the Code. At issue was the debtor's request for approval of the modification of its employee incentive plan, which was opposed by the U.S. Trustee. The court found that the requested modifications were within the ordinary course of debtor's business under § 363(c)(1) and were a business judgment made in good faith and with a reasonable basis. Id. at p. 9. The court read § 503(c)(1) to mean "a transfer made to ... an insider of the debtor for the *[primary]* purpose of inducing such person to remain with the debtor's business" and concluded that under such an interpretation, § 503(c)(1) did not apply to the bonus plan before it, rationalizing that failure to apply a materiality standard to the section would lead to absurd results. Id. at 12. Further, the court held that § 503(c)(3) did not apply

either because it is specifically limited to transactions outside of the ordinary course of business. Id. at 14.

Thus, the courts that have considered executive compensation arrangements after the enaction of section 503(c) of the Code have found that such plans may be permissible under subsection (c)(3) if their focus is to provide incentives to management employees based upon their performance during the reorganization process, as opposed to merely compensating them for remaining in the debtor's employ. As stated by the court in Dana II, "section 503(c)(3) gives the court discretion as to bonus and incentive plans, which are not primarily motivated by retention or in the nature of severance." 358 B.R. at 576, citing In re Nobex Corp., 2006 WL 4063024 (Bankr. D. Del. Jan. 19, 2006). Compensation arrangements for insiders may be allowable under §503(c)(3) if they are made within the ordinary course of business and are justified by the facts and circumstances of the case; in other words, if they are demonstrated to be a sound business judgment on the part of the debtor. Dana (II), 358 B.R. at 584; Nobex, 2006 WL 4063024 at p. 2; Global Home Products, 2007 WL 689747 at p. 8; Nellson Nutraceutical, 2007 WL 1502169 at p. 14.

*NewComm's Request to Assume the Employment Agreements of Lamoso & Grosso*

The Employment Agreements debtor requests to assume must be examined in light of section 503 of the Code and the case law which has developed since its enactment. The assumption of the employment agreements of Javier Lamoso and Federico Grosso is a fair and reasonable business judgment on the part of the debtor according to the particular circumstances of this case. It is supported by the Official Committee of Unsecured Creditors, and is not objected to by any party other than the U.S. Trustee. The debtor has established that Lamoso and Grosso are critical for a successful transaction pursuant to the Asset Purchase Agreement "APA" and the bidding procedures, and that they not only need to perform their regular duties and tend to the general administration of

- 25 -

the case, but they must operate the business in a manner to avoid any defaults under the DIP financing order or the APA and manage the current upgrade and built-out of the debtor's network in compliance with the Nortel Agreement, the DIP Facility and the APA. The Employment Agreements were designed to incentivize and reward the employees' performance, not only to achieve a successful sale of debtor's assets, but also to preserve the value of the assets post-transaction. The cost of the bonuses at issue is reasonable, particularly when viewed in relation to the sale price of debtor's assets. Although the Employment Agreements may have an element of retention, the same is incidental and does trigger the provisions of 11 U.S.C. § 503(c). The court finds that the pre-petition employment agreements are performance based incentive plans aimed at preserving and enhancing the estate, and are not administrative expenses to be paid form the estate from funds that would otherwise be paid to creditors. The court further finds that the assumption of the Employment Agreements is a fair and reasonable exercise of debtor's business judgment.

Further, the debtor has established that the elimination of the emergence bonus and severance payments would only benefit the purchaser of debtor's assets, and would have no impact on the unsecured creditors. The asset purchase agreement herein is structured so that the cost of the Employment Agreements is a component of the ultimate purchase price. Any payments of emergence bonuses or severance will simply be reflected as an increase in the purchase price, as it is a specified liability of the purchaser. See paragraph 3.5(b) of the Asset Purchase Agreement. A similar scenario occurred in <u>Official Committee of Unsecured Creditors v. Airway Industries (In re Airway Industries, Inc.)</u>, 354 B.R. 82, 87-88 (Bankr. W.D. Pa. 2006), wherein the court approved an arrangement where an affiliate of the purchaser agreed to make the bonus payments - an incentive to maximize the value of the assets being purchased - from its own funds. Although technically, as the U.S. Trustee points out, the bonus payments herein flow through the estate, as they are paid by

the purchaser to the debtor, the net effect on the estate is a "wash". See Transcript of Hearing held on 2/20/07, dkt. #343 at pp. 94 and 102-106. In sum, the pre-petition employment agreements are aimed at preserving and enhancing the value of the estate, are not administrative expenses to be paid from amounts that would otherwise be paid to creditors, will not deplete the estate at the expense of creditors, and not approving the same will only inure to the benefit of the purchaser..

## Conclusion

For the reasons set forth above, the debtor's motion for entry of an order authorizing the assumption of the Employment Agreements with Javier Lamoso and Federico Grosso is granted. Additionally, the debtor's request to assume the Success Bonus Program is also granted.

SO ORDERED.

In San Juan, Puerto Rico, this 26th day of July, 2007.

_____
ENRIQUE S. LAMOUTTE
U.S. Bankruptcy Judge